Good morning, ladies and gentlemen. Our first case for argument this morning is Anderson v. Raymond Corporation. Mr. Sokoloff. Good morning. May it please the Court. I'd like to focus this morning on two issues to start. Ms. Anderson's failure to create a jury question on whether a door would have stopped her from falling out of her forklift, and the trial court's prejudicial cross-examination of Raymond's lead causation expert. To start with the door, to get to a jury on her theory of the case, Ms. Anderson had to show with reasonable certainty that a non-latching spring-loaded door... Why? That is... Reasonable certainty does not sound like the ordinary civil standard of proof. It is not maybe the ordinary civil standard of proof, although I would say that it's not unknown in the law. It is, however, Illinois' standard of proof for a prima facie case in a tort case like this one. So... Where can we find the proposition that that is substantive law? You're not in an Illinois court. You're in a federal court. And the norm is that federal procedure governs in federal court. So where can we find the proposition that we should apply this, let's just say, very odd standard in a tort case in federal court? I think the best place to start is with this court's decision in Mayer. And what Mayer says is that at each stage of the case, we take the federal rules to determine what the baseline is in this case. It's could a reasonable jury find the evidence sufficient on an element of the case? And we look to state law to determine what that means under state law. So, for example, if state law has a preponderance standard, we apply a preponderance standard. If it's a clear evidence standard, we apply that. And here, as this court has recognized since in Lobianco and in Bao, the prima facie case, the standards for a prima facie case under Illinois law are effectively the burden of production that's imported into that standard. So let me back up a moment. The question here is whether any reasonable jury could find one of the elements met. And under Illinois law, a tort case doesn't go to a jury unless the plaintiff meets this reasonable certainty standard. And thus, if the plaintiff is able to meet that standard, the question is decided as a matter of law, even though we might typically think of proximate cause as a question for the jury. So to get to a jury on her theory of the case, Ms. Anderson had to show with reasonable certainty that this non-latching spring-loaded dorsier proposed would stop her from falling out of her forklift and being injured. The only evidence she came up with was her expert's opinion that a door could potentially stop a fall. Potentially is not a reasonable certainty, and it's not enough to survive a motion for directed verdict. That requires reversal on its own. A motion for what? Pardon? A motion for what? For directed verdict. There has not been a directed verdict in federal court in 30 years. There is a motion for judgment as a matter of law under Rule 50. But a directed verdict, as in England, is when the judge tells the jury what to do. It's completely different under Rule 50. And indeed, discarding bizarre and outdated language was the purpose of the change. I apologize for the bizarre language. We moved under Rule 50, and we renewed that motion at the close of trial, and then obviously we had our post-trial motions, which made the same point, that causation rested in this case on no more than the experts say so, and that Ms. Anderson hadn't carried her burden of production to bring her case to a jury. That requires reversal on the question of the effect of the door on its own. But that was not the only problem with the trial. Not only did the court decline to give judgment as a matter of law, it tipped the scales in Anderson's favor. At the close of evidence after the parties had concluded their examination of Raymond's lead causation witness, the court conducted its own examination, asking the witness a series of leading questions, mischaracterizing her testimony, and then interrupting her attempts to respond. Hearing that exchange just before closing arguments, the jury would... If you don't mind, before you move to the other evidence argument, is it the suggestion that Ms. Anderson needed to rebut the testimony of Raymond's expert? Not if you decide this case on the question of the effect of the door. We only need to get into the question of rebutting if we're talking about circumstantial evidence. And here their expert testified, initially he testified, a door would have kept Ms. Anderson in the forklift. Then when he was on cross-examination, he was asked, which ones of the aspects of the door that you think would have kept her in the forklift would work in the case of fall or slipping off, which is what Ms. Anderson says happened. So we don't need to, we can decide on that issue without getting into the question of whether she showed that's what happened to her. But here's what her expert had to say on direct examination. First, because, and this is a specific feature of this case the way it had to be argued, nationally accepted safety standards require that a forklift of this kind be made with an open compartment that allows free and easy egress. The way the plaintiffs wanted to litigate this case is to say we may not, adding a door may not go with the text of that standard, but it goes with the spirit. And so they had to argue that the door was so easy to open that it would be no different than allowing free and easy egress. So in answering a series of questions... This sounds like a repeat of the argument that lost in the first appeal. The argument that lost in the first appeal was whether that opinion could be presented as a matter of Rule 702, because there hadn't been testing to determine whether it was a viable basis for the expert's opinion. That's not the question anymore. The question is not whether they were permitted to opine, whether the expert was permitted to opine that the door should be added to the forklift. It's a question of proof. So here the expert testified it was very easy to open the door, it was like a screen door. This is at pages A67, 69. Half a blink of an eye, only added half a blink of an eye to the time it would take to step off of the forklift voluntarily. The expert explained that the door was helpful for three reasons. This is at A54, 55. It provided a visual reminder of the boundaries of the forklift, a tactile reminder, you could touch it and it would be like the rumble strips on the side of a highway, and as a barrier or an obstruction that would prevent someone from leaving. On cross-examination, though, he changed his tune, and you see this at the beginning of A77. He was asked, well, what would a door do for Ms. Anderson in the case of her slipping or falling off of her forklift? And he went feature by feature. Well, I don't know, I think a visual is probably irrelevant. That was his testimony about the visual benefits of the door. I don't know that tactile is necessarily irrelevant, he said, but he couldn't explain how it would be relevant. And here was his bottom line. I think if you're losing balance and encounter something that prohibits your foot from moving, that that would potentially basically stop your fall. That's all he said. That was the sum total of the evidence that a door would have prevented this accident. And causation was a key element of the claim here, whether you think about, I know they've argued that this was not our theory of design defect, we weren't required to show an alternative design, but what they told the jury from the outset of the case was if there had been a door on this forklift, she would not have fallen out, she would not have been injured. They couldn't get past the potential that it could have done that, and a potential is not a reasonable certainty. Moving on to the 614 question. Obviously causation was the key issue in this case, and given how good the evidence was, the testimony on causation from Raymond's expert was essential to the case. This was the last, Dr. Radowitz, our expert, was the last witness to testify. Counsel for both sides had concluded their examination, they sat down, and then the court started its examination. Let me ask you before you move on. If we don't agree with you that Illinois law forces us to take this out of the jury's hand and put it back in the judge's lap as a matter of law, given Myers' potentially basically testimony, because your argument boils down to that testimony on this matter of causation, do you still win on causation? So, there are two ways to win on causation that both, and this would be outright judgment for Raymond, they both rely on Illinois law being imported, which I'd say this is exactly what the court did in Lobianco, where it said to create a jury question, you need to show with reasonable certainty that the allegedly dangerous condition caused your injury. So it's not like this would be the first time the court has used this state law standard in a tort case in federal court. But both of the problems that we have with the causation finding here depend on Illinois law. But the arguments we have about the judge's questioning and about the other accidents don't rely. That's why I only asked you about causation. Yes. Exactly. Those are distinct. They don't rely in any way on Illinois law. They're just a straight application of the rules of evidence, and I think either way you look at it, Raymond was denied a fair trial and would be entitled to a retrial. So if I may, just to get into the Rule 614 issue, this court has held, and for a long time, that a judge may not assume the role of an advocate for either side by either signaling through his questions that he thinks a witness is not credible, or suggesting that he disbelieves a party's theory of the case, that's the Barnhart case we discussed. Well that's exactly what happened here. If you look, and I think that this is, the easiest place to follow it is in our short appendix starting on page 39, line 10. So here the court starts to question the expert's view of what happened, and mischaracterizing her testimony. The court says, you have her looking away from an accident she's about to encounter, correct? She agrees. Page 39, line 16, she may not be paying attention to the fact that she's about to be run over by a five-ton truck, but her body is positioned so that's exactly what is imminent, correct? The expert tries to answer, yes, her body is positioned so that her toes are toward the wheel, and she's, court cuts her off, all right. And he follows up with another leading question that mischaracterizes her testimony. I think the entire back and forth from short appendix 41-13 to 43-13, when we finally put the questioning by calling for a sidebar, is emblematic of the problem here. The court went on and on hammering the expert for an issue that I don't believe anyone else had brought up, which was that the court was concerned the expert hadn't determined how long it would take for the forklift to stop once Ms. Anderson's foot was in between the  That was not an issue that was relevant to any part of causation. But I thought the questioning was more focused on the positioning. So that in the initial set of questions were about positioning, and then from 41 to 43, it's just on this question of whether, how long it would have taken for the forklift to stop once she was caught in it. And here's what the court says. So this is at line 13, so her foot isn't going to stop this forklift, is it? No, and I, all right, he cuts her off. Then he asks her a series of questions that, leading questions. He says, this is 42 line 10, you didn't make any effort to try to calculate how long it would take for the truck to stop, line 16. Okay, you haven't attempted to calculate the distance of travel that would have caused her foot to get captured and the injury to be imposed. She tries to explain why that wasn't necessary. All right, he cuts her off again. And he continually reframes the question back to the versions of the facts that are friendly to the plaintiff's side, but that hadn't been explored on cross-examination. Now, when we called for a sidebar and we asked the judge, look, we're concerned that this is getting into territory that's going to be prejudicial, the court said, the plaintiffs can ask what they want to ask. I'm asking the questions that I'm interested in learning. So the court was not only signaling that it didn't take seriously the expert or that it thought she hadn't performed a thorough analysis, but I think was admitting that it wasn't using this questioning for any of the three purposes the court is typically allowed questioning of this kind. It wasn't moving proceedings along more quickly, he was actually adding time before the close of trial, but counsel had already concluded their examination. He wasn't clarifying any questions, there was no questions that anybody has identified that the expert hadn't answered clearly or addressed fully. And he wasn't following up to ensure that the witness was answering something that she hadn't addressed expressly in the cross-examination. So what the purpose of that was, it's not clear, but to the extent the court was interested in what it said it was interested in, which was preparing for ruling on a directed verdict or a judgment as a matter of law, it could have done that outside the presence of the jury without prejudicing Raymond. If there are no further questions, I'll save the balance of my time. Certainly, counsel. Mr. Shoeping. Thank you. May it please the court, Trent Shoeping on behalf of Ms. Anderson. I'd like to pick up on what we've been told about this quote, about the phrase potentially basically. If this court will remember in Raymond's opening brief, they kept going back and repeating this quote about potentially virtually impossible from Dr. Meyer. And in their opening brief, they told this court that Dr. Meyer says potentially virtually impossible to say that the forces of the forklift would be enough to take Mrs. Anderson out of the forklift. Now as we pointed out in our response brief, that was taken out of context. He never said it was potentially virtually impossible to say that Ms. Anderson would come out of the forklift as a result of hitting these cracks. And we've cited to the place in the record and showed that in context, Dr. Meyer is being asked about a recreation of the thing that was done by a defense expert who had gotten into a forklift and driven around the warehouse supposedly to recreate the path that Ms. Anderson took. And Dr. Meyer said that recreation of it, that it was potentially virtually impossible that the defense expert had been able to recreate the exact path and hit the exact same cracks that Ms. Anderson would have hit. In their reply brief, this is the first time that we see Raymond start trying to rely on this quote of potentially basically. That did not appear. That was the first thing. That was the central point of Raymond's argument this morning. It did not appear until their reply brief. So let's take a look at that and see again if Raymond isn't taking a quote out of context. Now there's maybe a hint of this in argument this morning, but I don't think it fairly put the quote in context. We can find this on a page in Ms. Anderson's appendix. It's appendix 77 and 78. I'm sorry, that might actually be Raymond's appendix. But it appears in the record of the court. It's document 361. It's pages 74 and 75. This is Dr. Meyer on cross-examination. Now as counsel had mentioned, Dr. Meyer testified that the door serves three purposes. He compared it to what you have on a highway. He said that there's a visual reminder to stay there, just like you see a lane marker on a highway kind of lets you know where you need to be. He said there's a tactile reminder that gives you some mobility. That's sort of like hitting the rumble strips. You can imagine standing on the 40th story of a hotel balcony. If you're standing there and there's a railing there, you feel quite secure and you don't feel like you're about to fall over. You take away that railing and you're standing 40 stories high. It becomes a different scenario. Most importantly here, he said it is a physical barrier that keeps people in the machine. And it's in our briefing and it's in his testimony as to how he's able to reach that conclusion. Going back to this potentially basically quote, on cross-examination, we see on the page before the quote that he's being asked about this tactile reminder. And he says he doesn't know. He says visually it may be probably irrelevant. But he doesn't say that the tactile is necessarily irrelevant. He says, we turn to the next page. He says, well, Ms. Anderson is slipping. The fact that her left foot hits the door isn't going to remind her to stay in. Isn't going to remind her. That's talking again about the tactile reminder to stay in. She's slipping out, right? That's your opinion. And he says, well, I think we discussed earlier. She's slipping. That's someone else who's losing her balance. And I think if you're losing your balance and encounter something that prohibits your foot from moving, that would potentially basically stop your fall. In context, it is clear he is talking about that one element of the protection the door provides, the tactile reminder. He's quite clear in his testimony, which is in Anderson's appendix at page 344, that the door would have kept her in this machine. In his testimony, he explains how he's able to give that opinion because doors have a perfect safety record of keeping operators in this machine. So we hear this argument that there's some inconsistency with the door that allows people to exit when they need to exit or want to exit, but keeps them in when they need to stay in. That's not inconsistent. That happens all the time. We can imagine we see police officers are quite adept at getting out of their cruisers when they need to. At the same time, doors keep them in the cars in all normal situations. And my friend is a counsel to this case. I've been working on these forklift cases for over 10 years. Counsel for forklift manufacturers repeatedly tell juries the exact opposite, that a door will trap an operator. That is why they say they don't put doors on it, because we will not trap an operator in the event of an off-dock. So to now take the position that a door would not restrain an operator is contrary to what they've been arguing for 20 years. Now, with respect to causation, this idea of reasonable certainty, that is not the burden of proof. The burden of proof is always going to be preponderance of the evidence. As the jury was appropriately charged, the defendant never submitted any sort of jury charge that would somehow charge the jury to a higher burden of proof. And we see, with respect to this reasonable certainty, we see in the cases of this court as well as the cases of Illinois courts, that it does not indicate some high impossible to meet standard that you have to prove that nothing else could possibly have happened. You just need to have evidence that allows it to be true. How was the jury instructed about the burden of persuasion? That occurs, it's, I'm sorry I don't have the appendix site, but it's in docket entry 383 in the lower court on page 208. How was the jury instructed? What was it told? They were correctly charged. I just want to know what it was told. Editorial commentary can come later. Yes, sir. They were told that the plaintiff had the burden of proof, it was a preponderance of the evidence, and that that means it's more likely true than not true. So the jury was given a preponderance instruction. Yes, sir. Was there any objection to that instruction? There was not. Okay, thank you. And so when we look at the Illinois cases and the cases of this court, what we see is the same thing applies to every case. You can't have a jury that is just left to speculate. If there's nothing to indicate that one thing is more likely than the other, you don't have that. Now here I'm not going to recite all the evidence that we cite in our brief. Ms. Anderson said that she lost her balance, it started shaking, and she came out with the machine. Now, as a preliminary matter, it's rather a false premise, this idea that somehow we have to prove that she fell. What the jury was charged was that the plaintiff contended the machine was unreasonably dangerous because it hadn't opened back. The question is, did that open back allow Ms. Anderson to come out? Frankly, it does not matter how she came out. Now, as a matter of truth, and before counsel gets up and says, I'm somehow running from this, all the evidence in the case shows that she hit the crack, it started shaking, and she fell out. But again, it's this false premise to say that we have to do that. But it's also this idea that we have to prove that the reasonable alternative design would prevent the accident is just inconsistent with black law, black letter Illinois law. There is no obligation on behalf of Ms. Anderson to show a reasonable alternative design at all. Obviously, if she doesn't have to, if she can be successful without showing a reasonable alternative design, she is not required to also show that it would have prevented the incident. Now, here we think we did. There's more than ample evidence to allow a jury to do that. But this whole idea that Anderson had to prove that she fell or that she had to prove that the door would prevent her fall is just inconsistent with Illinois law and with what the jury was charged. And again, there were no objections to the charge. There's no objection. I mean, there might have been some objections. There's no objection that has been raised to the charge in this court. And none below that are relevant to where we are now. And we see the Baugh case that was before this court recently is a good example of that. In that case, a man was injured while working on a ladder. And much like here, both sides had experts. In that case, unlike here, you did not have the testimony of the man who was on the ladder. He was rendered unable to testify as a result of his fall. Here, of course, we have Ms. Anderson explaining how she came out of the forklift, importantly explaining how she did not come out, testifying that she did not jump out. She did not get out. She was someone who followed her rules and would not have gotten out. We have other evidence showing that where this incident happened was a place that she would have no reason to get out. But going back to Baugh, we have the man on the ladder. He cannot testify as to how he came off the ladder. And a defense expert said, had this theory. And I listened to the oral argument recently in that case, which is available, and you get a better sense even of what the defense expert said. The defense expert said that he was on this ladder and somehow working backwards to work on some screws related to his gutters. According to the defense theory of this, he also would have had to put the ladder in his flower bed, which would be strange. And according to defense theory of this, as the court pointed out, it would have had this man who was in his 50s straddling the top of the ladder and putting one foot here and one foot there. In the oral argument, one of the judges characterized this theory as, I believe, frankly preposterous. And that's what we have here. We have Ms. Rodowicz, or Dr. Rodowicz, who comes in and says that Ms. Anderson left this forklift on her own account that she somehow muscularly decided in the middle of nowhere, contrary to the training that we know she received, contrary to the training that we know that she followed, she randomly decided to just get out of this machine and let it run over her foot. Neither the jury nor the court is required to accept that, and certainly not in light of all the other evidence here showing that the reason why Ms. Anderson came out was because she hit a crack and started shaking and she lost her balance. I'd like to address this issue with the judges' questions. Do you mind if we, before we get to the judges' questions and what was asked under that standard, the future risk of injury damages of the 2 million? I would like to go there in making sure that the giving of the instruction, and more importantly, was there sufficient evidence for that damages award for future risk? There was, and this, to some extent, is an emerging area of the law. Did you say emerging? Emerging, somewhat, in sort of the slow churn of the law through the years. And we see this in the Dillon case where Illinois has adopted this category of damages. There was recently the Institute for Law and Economics had a, part of their working paper series had a paper on this in 2009. And what we find is that historically, in the United States, we had this all-or-nothing approach to future risk of harm. And so what we're looking at here is we have a case like this where, in Ms. Anderson's case, she's lost her leg and the testimony is now that she falls, that she's going to, from the time she lost her leg through the present day at trial, that she occasionally experiences these falls. Well, as we all know, falls, particularly if someone is their age, but even at their current age of 56, 57, can have potentially catastrophic future injuries too. Historically, what the law said was that if you can't prove with certainty that you're going to have this harm, that you can't recover for it, for this future risk of harm, right? Which, you know, it's trying to balance this competing thing, right? If you're the tortfeasor, you don't want to have to pay full damages for harm, which may not occur. That would be a windfall for the plaintiff. However, if you're the plaintiff, you are harmed because you have this future risk. So in the same way that a car, a used car that has been in a wreck, if you take two identical used cars and one has been in a wreck and one has not, one is going to have a lesser value. It's going to have been harmed from that wreck because the perception and probably the reality is that that car is more likely to have problems in the future. So same thing with Ms. Anderson. If we could imagine that our brains were going to be transplanted into the body of a 56-year-old woman in Effingham, Illinois, and there are two women who are exactly the same in every way, except that one of them was prone and subject to falling, any rational person would say that is the lesser of the two options. That one is damaged, right? And so what Illinois did in the Dillon case is they made a policy decision. I know Dillon's a little bit more broad, but I really want to focus on Foley versus Fletcher. Sure. And, you know, that case does not go into great detail. It's in some ways a rather cursory treatment of it. And there you have, I believe, it's a birth injury case. And in some ways to indicate how cursory the opinion is, there's two experts that apparently were relevant. One, I believe, is Thornton, and I forget the name of the other one. And the court, frankly, doesn't even address the testimony of one of the two experts. Perhaps it just was not very important. But what they say is that the one expert couldn't give any kind of indication as to whether or not the risk of, I believe, scoliosis and hip issues, whether it was light, moderate, or severe, right? And so they said, well, there's really no evidence that would allow the jury to sort of figure out what happens. And what type of evidence is required? I don't think, you know, the nature of it is that it inherently is going to be slightly imprecise, right? What did Illinois require from that Foley case? I think just the same standard. You just have to have some evidence that would allow a jury to do its job. And in this case, we have evidence that she's fallen, that she's going to continue to fall. It doesn't – the nature of any evidence on future increased risk, if we had a crystal ball, obviously, we could get it exactly precise. Was there any medical evidence needed, any specific numerical probability needed? What type of evidence was needed other than my friend saying I'm 56 years old and I'm more likely to fall? Well, here we had a couple. We had the life care plan. I'm asking what is the law? The law? I think it's going to vary case by case, and I think it's going to vary on what it is. What has Illinois said is required? I think – I apologize, Your Honor, I may not have the exact, you know, wording, but essentially the import of it is essentially is just some evidence to allow the jury, based on the facts of that case, to make a reasonable decision. And I think what satisfies that will vary case by case. If, for instance, we had claimed that Ms. Anderson was at an increased risk of having tuberculosis because of her leg, well, perhaps we might need an expert to come in and say it's 10%, or someone with a birth injury to say this baby, you know, had their chance of getting scoliosis when they're 50. That's obviously going to be beyond the ken of a jury. I don't think it's beyond the knowledge of a layperson. In this case, what we're talking about is the increased risk to her from falls. That is not something that a jury is going to need an expert to come in and talk about. Now, as it so happens, we do have some testimony in the record from Dr. Rodowitz about the harm that can happen to falls and concussions and head trauma, that kind of thing. But this is not a case, I think, like one where if you were saying it was, you know, an increased chance of some obscure cancer, you were exposed to chemicals and therefore the claim is having, you know, an increased risk of, you know, lymphoma, you know, later on down the road. I think that might require some sort of expert testimony. Here it wasn't necessary. We have in the record from multiple sources that she's fallen. A jury is able to conclude that if she started falling after the amputation, if she continued to have these falls all the way through trial, which occurred several years later, that she's likely to continue falling in the future. Turning to the judge's questions, Raymond characterizes it one way. We're talking roughly about 12, 13 pages out of a seven-day trial. It's a very minuscule part of this trial. And so the court will have no problem reading it for itself and coming to its own conclusion. What I would suggest is that Raymond tells us these things about it. And when the court reads the testimony, it will not find them to be there. Raymond tells us that it's sarcastic and aggressive and hostile. Frankly, I think because they can't show us that that is the case. Now, this court, if it is frustrated upon trying to read this cold record, will not be the first court to acknowledge some frustration. A lot of decisions in this court say it's, you know, look, we're just reading this record cold. We weren't there. We don't know tone of voice, anything like that. So I think the question becomes, what lens should this court use when it looks at it? What can we look at to see what this might have been like? I think one thing that's telling is that Judge McGlynn had handled this case for roughly five years through two very lengthy trials, through incredible amounts of motion practice. We see nowhere in the record that he's ever had any hostility to any of the parties, to any of their witnesses. Throughout trial, he was polite, if anything. He made rulings in favor of Raymond. He limited the case to the door issue. Previous to this, he had struck the door. Ms. Anderson was the one who came up and got it reversed last time. But what we see is that Judge McGlynn in no way ever showed any kind of prejudice or made any— they don't complain about him making any inappropriate comments, right? And we see that in the cases where courts have found the judges questioning to be problematic. I think it's also appropriate for this court to look to Judge McGlynn himself. He was there. He gives us another lens into this because Raymond will be biased to it. Ms. Anderson will be biased to it. What we see is that when the objection was made by Raymond, Judge McGlynn did not say, oh, you know what? You're right. I'll stop this. Judge McGlynn, who was there, said, no, it's okay. I'm allowed to do this, and she's doing just fine. What about Raymond's point that Judge McGlynn starts introducing issues that neither party had developed during their examination? And, for example, at one point, he starts presenting a scenario to Dr. Radowitz about Ms. Anderson grabbing onto the tiller or continuing to fall while she's holding onto the tiller. Was that a theory or a scenario that Ms. Anderson had presented during cross? Unfortunately, I don't have the citation, but I believe it is in our brief there. I believe she was asked about where the hand would be. And it's a natural question because, again, Ms. Radowitz was presented as a witness who was going to testify as to how the accident happened and where the body was. So, for instance, in the transcript below is document 388, page 171, 6 through 9. Dr. Radowitz says she was asked to determine the mechanisms for the injuries, so specifically referring to Ms. Anderson, how she moved and how she interacted with her forklift. So Dr. Radowitz came and said, I'm going to testify about how she interacted with the forklift. It's natural that the judge would maybe have a question about how that interaction took place. So is your overall response to Raymond's argument in their reply brief and now that he was introducing things that nobody had talked about before that is just not the case? There's no instance of that? I'm pretty certain there's nothing in there that had not been talked about. Again, she was on direct for roughly 78 pages, I believe. She was on cross for another 60. Everything had gone over in great detail, including the positioning of the machine, how she got that, and the location of the thing. Now, in their briefing, Raymond admits that they say there's no issue. They don't think any new evidence was brought out. Their whole argument, as they indicate in their reply brief, is that they think the questions somehow had some sort of bad tone to them, which Judge McGlynn, in the hearing on this for their motion when they asked for a motion for a new retrial, said that he remembered it well. He said that he looked back when he was ruling on it. He reviewed it, but he didn't think he showed any kind of favoritism to it right. So that's on document 440 at page 17. I think fundamentally, given the standard for abuse of discretion as well as the sort of decision this court would have to follow, there's no way to grant a new trial. Thank you, counsel. Your time has expired. Thank you, Judge. Mr. Sokoloff, anything further? Just a few very quick points, if I may. On causation, everything that you heard from me about the door and what it would or wouldn't do you will find in the blue brief, our opening brief from pages 36 to 38, including the potentially, basically, comment. We are not taking the position, Raymond is not taking the position, that a door won't keep somebody in the compartment. It was, under their theory of the case, their burden to establish that it would have kept Ms. Anderson in the compartment. That was their theory of liability. The jury was instructed on the appropriate preponderance standard, but in antitrust cases, we have the Matsushita standard, which also requires you to rub out competing inferences, and nobody thinks that changes the preponderance standard at the end of the day. On future damages, Judge Pryor, you asked about what the standard is under Illinois law, and I can just tell you, since I have it here. So in Foley, the court explained that you have to quantify the risks of future injury and that the testimony or evidence fails if it does not specify the level of increased risk or prove the degree of risk within a reasonable degree of certainty. So when the life player planner says to the jury, she falls multiple times a month, that's a quote, and she says the risk would be ongoing of these falls, how does that not, in your view, quantify and give reasonable certainty about future falls? I think what it doesn't do is it doesn't explain or she does not opine that it is her opinion that it is likely to occur to a certain degree a certain number of times. So it's a magic words problem? No, I don't think it's a magic words problem, just like when we're asking any expert to opine on the probability that something will happen. And the reason this is important is that the damages award has to be adjusted by the likelihood that it will happen, right? So first the jury decides how much is the injury worth? Here it decided it was worth $2 million, the same as they awarded for the loss of the foot. And you have to multiply that by the likelihood that it's going to recur. So you need something more precise. You need something precise that you can actually use as the multiplier here. And saying, well, she's fallen before and she's likely to fall again doesn't give that quantification, the specific risk that the injury will recur. Turning to the Rule 614 issue, there's no need for us to show actual bias. The question is what the jury would have come away with. And I think that it's clear from the questioning, and Judge Jackson-Akumi, you pointed this out, that the court steered into territory that hadn't been covered on cross-examination, and I'm sure that if Ms. Anderson thought it had been, she would direct you to where in the record that was. Counsel pointed out that the judge didn't stop as soon as the objection was raised, and so that must mean the judge thought it was okay. Well, it's true that the court was entitled to ask questions. It did say that Dr. Radowitz was a big girl and she could handle herself, but it stopped the questioning almost immediately after that sidebar. I think there were one or two questions afterwards, and I think that that is out of a recognition that the questioning had gone too far. If there are no further questions, thank you very much. Thank you very much. The case is taken under advisement.